2022 IL App (4th) 220257
NOS. 4-22-0257, 4-22-0258, 4-22-0259, 4-22-0260 cons.

FILED
August 22, 2022
Carla Bender
4th District Appellate
Court, IL

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| *In re* D.D. A Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Winnebago County |
| Petitioner-Appellee, | ) | No. 19JA36 |
| v.      (No. 4-22-0257) | ) | |
| Stefani D., | ) | |
| Respondent-Appellant). | ) | |
| _____ | ) | |
| *In re* B.D., a Minor | ) | |
| | ) | No. 19JA37 |
| (The People of the State of Illinois, | ) | |
| Petitioner-Appellee, | ) | |
| v.      (No. 4-22-0258) | ) | |
| Stefani D., | ) | |
| Respondent-Appellant). | ) | |
| _____ | ) | |
| *In re* A.D., a Minor | ) | |
| | ) | No. 19JA38 |
| (The People of the State of Illinois, | ) | |
| Petitioner-Appellee, | ) | |
| v.      (No. 4-22-0259) | ) | |
| Stefani D., | ) | |
| Respondent-Appellant). | ) | |
| _____ | ) | |
| *In re* C.D., a Minor | ) | |
| | ) | No. 19JA39 |
| (The People of the State of Illinois, | ) | |
| Petitioner-Appellee, | ) | |
| v.      (No. 4-22-0260) | ) | Honorable |
| Stefani D., | ) | Mary Linn Green, |
| Respondent-Appellant). | ) | Judge Presiding. |

JUSTICE TURNER delivered the judgment of the court, with opinion.
Justices Cavanagh and Zenoff concurred in the judgment and opinion.

**OPINION**

¶ 1 In November 2020, the State filed motions to terminate the parental rights of respondent, Stefani D., as to her minor children, D.D. (born September 2015), B.D. (born November 2014), A.D. (born September 2012), and C.D. (born September 2011). In May 2021, the circuit court found respondent was an unfit parent, and in March 2022, the court found it was in the minor children's best interests to terminate respondent's parental rights. The court also terminated the parental rights of the minor children's father, Michael D.; however, he is not a party to this appeal.

¶ 2 In these consolidated appeals, respondent argues (1) her due process rights were violated because the trial judge had previously presided over numerous hearings and had changed the goal to termination of parental rights, (2) the circuit court erred by finding her unfit because the State's evidence (a) contained multiple levels of hearsay that were inadmissible and (b) was insufficient to prove her unfit on all grounds, and (3) the circuit court erred by finding it was in the minor children's best interests to terminate her parental rights. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4 On January 23, 2019, the State filed separate petitions for the adjudication of wardship of the minor children. The petitions alleged the minor children were neglected pursuant to section 2-3(1)(b) of the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3(1)(b) (West 2018)) because their environment was injurious to their welfare based on (1) the minors living in a residence "with old food all over the floors, couch, tables, and mattresses and with trash, dirty diapers, and cat feces on the floor and furniture and on the minors' feet and the minors were wearing dirty clothing, thereby placing the minors at risk of harm" and (2) respondent previously failing to correct the unsanitary living conditions following the involvement of the Department of Children and Family Services (DCFS).

¶ 5        At the shelter care hearing, respondent agreed there was (1) probable cause to believe the children were neglected pursuant to section 2-3(1)(b) as alleged in the petitions and (2) an immediate and urgent necessity to remove the children from the home. The circuit court accepted the admissions, finding probable cause of neglect and placing the children in the temporary custody of DCFS.

¶ 6        On April 18, 2019, the circuit court held a joint adjudication and dispositional hearing. The assistant state's attorney indicated an agreement existed for both adjudication and disposition. Respondent stipulated the minor children were neglected based on their unsanitary residence (count I). The court accepted respondent's stipulation, adjudicated the minor children neglected, and dismissed count II of the petition. The assistant state's attorney next recited the agreement respondent should be found unfit to care for, protect, train, or discipline the minor children; the minor children should be made wards of the court; and DCFS should be appointed as the minor children's guardian and custodian. The court accepted the agreement and entered a written dispositional order consistent with the agreement.

¶ 7        In November 2020, the State filed separate motions to terminate respondent's parental rights to each of the minor children. The motions collectively asserted respondent failed to (1) maintain a reasonable degree of interest, concern, or responsibility as to the children's welfare (750 ILCS 50/1(D)(b) (West 2020)); (2) protect the children from conditions within the environment injurious to their welfare (750 ILCS 50/1(D)(g) (West 2020)); (3) make reasonable efforts to correct the conditions that caused the children to be removed during any nine-month period after the neglect adjudication, specifically, the periods of September 8, 2019, to June 8, 2020, and January 27, 2020, to October 27, 2020 (750 ILCS 50/1(D)(m)(i) (West 2020)); and (4) make reasonable progress toward the return of the children during any nine-month period after

the neglect adjudication, specifically, the periods of September 8, 2019, to June 8, 2020, and January 27, 2020, to October 27, 2020 (750 ILCS 50/1/(D)(m)(ii) (West 2020)).

¶ 8                                    A. Fitness Hearing

¶ 9        On March 4, 2021, the circuit court held the fitness hearing. The State called Zachary Chadwick, a supervisor at Children's Home and Aid. The State introduced the following exhibits, which were admitted without objection: (1) respondent's integrated assessment, dated April 3, 2019 (State's exhibit No. 1); (2) a service plan dated March 8, 2019 (State's exhibit No. 2); (3) a service plan dated April 1, 2019 (State's exhibit No. 3); (4) a service plan dated July 13, 2019 (State's exhibit No. 4); (5) a service plan dated January 10, 2020 (State's exhibit No. 5); (6) a service plan dated July 15, 2020 (State's exhibit No. 6); and (7) a service plan dated January 20, 2021 (State's exhibit No. 7).

¶ 10        The integrated assessment stated respondent had periodically lived in a vehicle with the four children, sometimes for days or weeks at a time. Additionally, respondent had been evicted from two houses due to her inability to keep the houses in a sanitary and hygienic condition. The service plan dated January 10, 2020, revealed respondent canceled eight individual counseling sessions and failed to appear on six occasions between July and November 2019 and therefore had been discharged. The service plan dated July 15, 2020, stated respondent required another referral for individual counseling due to her discharge and had been asked to complete a mental health assessment again. Collectively, the service plans showed respondent had never progressed to a point where she was able to have unsupervised visits with the children.

¶ 11        Chadwick testified the first service plan required respondent to (1) cooperate with the agency, (2) complete a parenting education course and follow recommendations, (3) complete a substance abuse assessment and follow any recommendations made, (4) complete any mental

health services, (5) complete individual counseling, and (6) attend visits with the children. Although respondent maintained consistent contact with DCFS, completed parenting classes, and visited the children regularly, respondent failed to make progress in the area of mental health. Specifically, respondent was unsuccessfully discharged from family counseling in January 2020, and due to the agency's belief respondent had not been truthful in her initial mental health assessment, respondent had to take a second assessment, which had delayed her progress in this area. Respondent was never able to have unsupervised visits with the children because, according to Chadwick, "[i]t was not deemed, through case management or supervision, that [respondent] had made enough progress in the case to have *** helped correct the condition that brought the case into care."

¶ 12    The State also introduced State's exhibit Nos. 8, 9, and 10, which were packets documenting the investigations wherein respondent was indicated for environmental neglect of the children. The exhibits were admitted without objection. Collectively, the packets showed respondent had been indicated for environmental neglect in October 2012, April 2016, and January 2019. The January 2019 packet stated respondent had been arrested for possession of ecstasy and driving while her license was revoked while the children (ages 7, 6, 4, and 3) were at home. According to the packet, an individual took food to the residence for the children and contacted police because of the condition of the home. The individual who reported the information described the home as follows:

> "[T]he residence had old food all over the floors, couch, living room tables, mattress in [the] living room and *** dirty dishes on the sink. [Reporter] stated that there were pans with tobacco cut up in them with old noodles. [Reporter] stated that there was trash all over the floors, dirty used diapers on the floors and cat feces on

the floor and furniture. [Reporter] stated that the children could get ahold of the trash, dirty diapers, old food and cat feces. [Reporter] stated that children had the cat feces and other stuff on their feet. [Reporter stated] that the odor was strong and smelled like cat urine and marijuana."

¶ 13    The State further requested the court take judicial notice of the neglect petition, adjudicatory and dispositional orders, and permanency review orders. The proceedings were thereafter continued to May 13, 2021.

¶ 14    At the continued fitness hearing, respondent testified she attended individual counseling with Sara LeDuc at Rosecrance and had completed parenting classes as recommended in her service plan. Respondent attended visits with all four children every week and was currently living with a friend and the friend's mother. Respondent later clarified she shared a bedroom with her friend and kept it clean.

¶ 15    On cross-examination, respondent admitted she had been asked to complete three mental health assessments because the agency believed respondent had not been truthful in the previous assessments. When asked about the condition of her home when the children were taken into care, respondent testified she was unaware of the condition because she was not present at that time as she had been arrested. Respondent admitted the home "needed to be cleaned" and agreed "the condition at the home that the officers would have observed would have been caused by [her] and [her] kids, not by anyone else living there."

¶ 16    At a July 6, 2021, hearing, the court found respondent unfit on all grounds asserted in the termination motions and entered a written order stating the same.

¶ 17                                      B. Best Interests Hearing

¶ 18    On September 16, 2021, the court proceeded to the best interests hearing. The State

presented the testimony of Massiel Blanco, who testified she had been the children's caseworker since December 2020. Blanco testified B.D., D.D., and C.D. currently resided in a traditional foster placement in Rockford, Illinois. The three siblings were bonded with their foster parents who met their needs, and they got along well. A.D. was also in a traditional foster placement in Roscoe, Illinois, and although she had bonded with her foster mother, A.D. told Blanco she wished to be placed with respondent. A.D. attended counseling and was diagnosed with reaction to severe stress due to being separated from her biological family, and she sometimes hit her foster brother. A.D.'s foster mother was willing to provide permanency through adoption.

¶ 19 The best interests hearing was continued to October 29, 2021. On cross-examination, Blanco testified she visited respondent's home, which she found to be clean. However, respondent did not have room for her children at her current home. According to Blanco, the children missed their mother and wished to see her more often. The State also called Janet Kueker, who was A.D.'s foster mother. Although A.D. had behavioral issues, Kueker was committed to adopting her. On cross-examination, Kueker testified although she and A.D. had a "very positive relationship," A.D. often cried at bedtime because she missed her family and was "jealous" she was not placed with her other siblings.

¶ 20 Following Kueker's testimony, the best interests hearing was continued to February 3, 2022. Respondent presented testimony from LeDuc, her mental health counselor, and Mikayla Jolly, respondent's roommate. LeDuc testified she had worked with respondent since May 2021. LeDuc treated respondent for anxiety and depression and respondent was "increasingly engaged." Jolly testified she had been living with respondent for over two years. Jolly's mother, brother, and grandmother also lived in the five-bedroom home. Jolly further testified respondent was a "clean" roommate who helped with chores every day.

¶ 21    Respondent testified she was employed at Zippy Taxi and worked 60 hours per week. She admitted when the case opened, her house was "dirty," which was a reason for her DCFS involvement. Respondent testified all of her children asked to go home with her after their visits. Respondent was currently compliant with her probation and was looking for housing. On cross-examination, respondent admitted she did not start individual counseling until after the children's permanency goal had been changed to substitute care pending termination of her parental rights.

¶ 22    Finally, Jeri Larrow testified she was D.D., B.D. and C.D.'s foster mother. She testified the boys got along well, but sometimes came home crying after visits because they missed their biological parents. Larrow was willing to adopt the three siblings and ensure they maintained contact with A.D.

¶ 23    Following the conclusion of testimony, the State argued the condition of the home "may have been temporarily addressed each time so that DCFS would not pursue a further case, but the evidence clearly shows that the conditions of the home returned," and respondent had not "even begun to address this yet." The guardian *ad litem* (GAL) argued respondent had "not taken any affirmative steps" to return the children to her care, noting she did not have a vehicle or suitable housing. DCFS counsel argued although respondent technically completed recommended services, she failed to "make progress in them" and "demonstrate that [she was] capable of applying what [she] had learned to parenting and to [her] interactions with the children." Respondent's counsel argued the State did not meet its burden as to best interests and it was not in the minor children's best interests to terminate respondent's parental rights.

¶ 24    At the conclusion of the hearing, the circuit court found the termination of respondent's parental rights was in the minor children's best interests. That same day, the court

entered a written order terminating respondent's parental rights to the minor children.

¶ 25    On March 30, 2022, respondent filed timely notices of appeal in sufficient compliance with Illinois Supreme Court Rule 303 (eff. July 1, 2017). See Ill. S. Ct. R. 660(b) (eff. Oct. 1, 2001) (providing the rules governing civil cases also govern appeals from final judgments in all proceedings under the Juvenile Court Act, except for delinquency cases). Thus, this court has jurisdiction of these consolidated appeals pursuant to Illinois Supreme Court Rule 307(a)(6) (eff. Nov. 1, 2017).

¶ 26                                    II. ANALYSIS

¶ 27    Under section 2-29(2) of the Juvenile Court Act (705 ILCS 405/2-29(2) (West 2020)), the involuntary termination of parental rights involves a two-step process. First, the State must prove by clear and convincing evidence the parent is "unfit," as that term is defined in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2020)). *In re Donald A.G.*, 221 Ill. 2d 234, 244, 850 N.E.2d 172, 177 (2006). If the circuit court makes a finding of unfitness, then the State must prove by a preponderance of the evidence it is in the minor children's best interests that parental rights be terminated. *In re D.T.*, 212 Ill. 2d 347, 366, 818 N.E.2d 1214, 1228 (2004).

¶ 28    Since the circuit court has the best opportunity to observe the demeanor and conduct of the parties and witnesses, it is in the best position to determine the credibility and weight of the witnesses' testimony. *In re E.S.*, 324 Ill. App. 3d 661, 667, 756 N.E.2d 422, 427 (2001). Further, in matters involving minors, the circuit court receives broad discretion and great deference. *E.S.*, 324 Ill. App. 3d at 667. Thus, a reviewing court will not disturb a circuit court's unfitness finding and best-interests determination unless they are contrary to the manifest weight of the evidence. See *In re Gwynne P.*, 215 Ill. 2d 340, 354, 830 N.E.2d 508, 516-17 (2005) (fitness finding). A circuit court's decision is against the manifest weight of the evidence only where the opposite

conclusion is clearly apparent. *Gwynne P.*, 215 Ill. 2d at 354.

¶ 29                                    A. Due Process

¶ 30        We first address respondent's argument her due process rights were violated because the circuit judge had presided over numerous hearings during which she considered voluminous evidence that contained multiple levels of hearsay and changed the goal from return home to termination of parental rights. Respondent acknowledges she forfeited this argument by failing to raise it in the circuit court but requests we review the issue under the plain-error doctrine (Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967)).

¶ 31        The plain-error doctrine permits a reviewing court to consider unpreserved error under the following two scenarios:

>       "(1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Sargent*, 239 Ill. 2d 166, 189, 940 N.E.2d 1045, 1058 (2010).

We begin a plain-error analysis by first determining whether any error occurred at all. *Sargent*, 239 Ill. 2d at 189. If error did occur, this court then considers whether either of the two prongs of the plain-error doctrine has been satisfied. *Sargent*, 239 Ill. 2d at 189-90. "Under both prongs of the plain-error doctrine, the defendant has the burden of persuasion." *People v. Hillier*, 237 Ill. 2d 539, 545, 931 N.E.2d 1184, 1187 (2010). If the defendant fails to meet his or her burden of persuasion, the reviewing court applies the procedural default. *Hillier*, 237 Ill. 2d at 545.

¶ 32        Respondent contends a trial judge who presides over the proceedings in a wardship

case is exposed to voluminous amounts of information about the parties that is inadmissible at a hearing on a motion to terminate parental rights. She asserts the procedure of having the same judge preside over years of hearings with "reams of multilevel hearsay" creates the risk of erroneously depriving the parent of his or her constitutional right to raise their children. She requests this court adopt a rule in termination proceedings requiring the termination motion to be heard by a different judge who has not made earlier findings regarding efforts and progress at permanency hearings and ordered a change of the goal to termination of parental rights.

¶ 33    This court recently addressed this exact issue in *In re J.J.*, 2022 IL App (4th) 220131-U. See Ill. S. Ct. R. 23(e)(1) (eff. Jan. 1, 2021) (stating nonprecedential orders entered on or after January 1, 2021, may be cited for persuasive purposes). There, we explained as follows:

"[O]ur supreme court disagrees with respondent's position. Illinois Supreme Court Rule 900(a) (eff. Mar. 8, 2016) sets forth the purpose of the rules addressing child custody or allocation of parental responsibilities proceedings, which includes proceedings under the Juvenile Court Act. The rule explains the unique responsibility imposed on trial courts in such proceedings. See Ill. S. Ct. R. 900(a) (eff. Mar. 8, 2016). Specifically, the rule notes, '[w]hen a child is a ward of the court, the physical and emotional well-being of the child is literally the business of the court.' Ill. S. Ct. R. 900(a) (eff. Mar. 8, 2016). The purpose of the specific rules is to (1) expedite cases affecting the custody or allocation of parental responsibilities of a child, (2) ensure the coordination of custody or allocation of parental responsibilities matters filed under different statutory acts, and (3) focus child custody or allocation of parental responsibilities proceedings on the best interests of the child, while protecting the rights of other parties to the proceedings.

Ill. S. Ct. R. 900(a) (eff. Mar. 8, 2016). Illinois Supreme Court Rule 903 (eff. Mar. 8, 2016) then provides, '[w]henever possible and appropriate, all child custody and allocation of parental responsibilities proceedings relating to an individual child shall be conducted by a single judge.' 'Thus, our supreme court has expressed a preference for the same judge to hear all proceedings involving child custody and the division of parental responsibilities.' *In re Z.J.*, 2020 IL App (2d) 190824, ¶ 85, 168 N.E.3d 210." *J.J.*, 2022 IL App (4th) 220131-U, ¶ 25.

This court then compared proceedings under the Juvenile Court Act to criminal proceedings, noting "[w]hen the trial judge is the trier of fact, the reviewing court presumes the judge considered only admissible evidence and disregarded inadmissible evidence in reaching its decision" and this presumption applies equally in civil cases such as the one at bar. *J.J.*, 2022 IL App (4th) 220131-U, ¶ 26 (citing *People v. Naylor*, 229 Ill. 2d 584, 603, 893 N.E.2d 653, 665 (2008)). Like the respondent father in *J.J.*, respondent's argument here runs contrary to this presumption.

¶ 34         Additionally, the *J.J.* court explained, "[A]fter a substantive ruling has been made in a civil case, section 2-1001(a)(3) of the Code of Civil Procedure (735 ILCS 5/2-1001(a)(3) (West 2020)) allows for a substitution of judge '[w]hen cause exists.' " *J.J.*, 2022 IL App (4th) 220131-U, ¶ 27. "Judges are presumed impartial, and the burden of overcoming that presumption rests on the party making the charge," which generally requires a showing of actual prejudice— *i.e.*, "prejudicial trial conduct or personal bias." *J.J.*, 2022 IL App (4th) 220131-U, ¶ 27 (citing *In re Marriage of O'Brien*, 2011 IL 109039, ¶¶ 30-31, 958 N.E.2d 647). Once again, like the respondent father in *J.J.*, respondent's argument and proposed rule here run contrary to the presumption of impartiality.

¶ 35         Finally, respondent's reliance on Justice Steigmann's special concurrence in *In re*

- 12 -

*A.T.*, 197 Ill. App. 3d 821, 555 N.E.2d 402 (1990), is misplaced. There, Justice Steigmann stated when a *judge* has indicated a need for filing a petition to terminate parental rights, the judge must recuse herself from any proceedings on that petition once it is filed. *A.T.*, 197 Ill. App. 3d at 835 (Steigmann, J., specially concurring). Here, it was the *State and GAL* who requested the goal be changed to substitute care pending the termination of respondent's parental rights at the October 2020 permanency hearing. The circuit court found respondent had not made reasonable efforts or reasonable progress towards the goal of return home and thus changed the goal. Unlike the circumstances suggested by Justice Steigmann's concurrence, the circuit court here changed the goal based on the requests of the State and the GAL and did not *sua sponte* find a need for filing a motion to terminate parental rights.

¶ 36        Accordingly, we find respondent has failed to show a violation of her due process rights. Since respondent failed to establish an error, there can be no plain error.

¶ 37                          B. Respondent's Fitness

¶ 38        Respondent also argues the circuit court erred by finding her unfit. In this case, the circuit court found respondent unfit on all four grounds alleged in the petition, including under section 1(D)(m)(ii) of the Adoption Act (750 ILCS 50/1(D)(m)(ii) (West 2020)). Section 1(D)(m)(ii) provides a parent may be found unfit if she fails "to make reasonable progress toward the return of the child[ren] to the parent during any 9-month period following the adjudication of neglected or abused minor under Section 2-3 of the Juvenile Court Act." 750 ILCS 50/1(D)(m)(ii) (West 2020). Illinois courts have defined "reasonable progress" as "demonstrable movement toward the goal of reunification." (Internal quotation marks omitted.) *In re Reiny S.*, 374 Ill. App. 3d 1036, 1046, 871 N.E.2d 835, 844 (2007) (quoting *In re C.N.*, 196 Ill. 2d 181, 211, 752 N.E.2d 1030, 1047 (2001)). In *Reiny S.*, the First District defined reasonable progress as follows:

- 13 -

"[T]he benchmark for measuring a parent's progress toward the return of the child[ren] under section 1(D)(m) of the Adoption Act encompasses the parent's compliance with the service plans and the court's directives, in light of the condition which gave rise to the removal of the child[ren], and in light of other conditions which later became known and which would prevent the court from returning custody of the child[ren] to the parent." (Internal quotation marks omitted.) *Reiny S.*, 374 Ill. App. 3d at 1046 (quoting *C.N.*, 196 Ill. 2d at 216-17).

Additionally, this court has explained reasonable progress exists when the circuit court

"can conclude that *** the court, in the *near future*, will be able to order the child[ren] returned to parental custody. The court will be able to order the child[ren] returned to parental custody in the near future because, at that point, the parent *will have fully complied* with the directives previously given to the parent in order to regain custody of the child[ren]." (Emphases in original.) *In re L.L.S.*, 218 Ill. App. 3d 444, 461, 577 N.E.2d 1375, 1387 (1991).

We have also emphasized " 'reasonable progress' is an 'objective standard.' " *In re F.P.*, 2014 IL App (4th) 140360, ¶ 88, 19 N.E.3d 227 (quoting *L.L.S.*, 218 Ill. App. 3d at 461).

¶ 39         In determining a parent's unfitness based on a lack of reasonable progress, the court may only consider evidence from the relevant time period. *Reiny S.*, 374 Ill. App. 3d at 1046 (citing *In re D.F.*, 208 Ill. 2d 223, 237-38, 802 N.E.2d 800, 809 (2003)). Courts are limited to the period alleged in the motion to terminate parental rights "because reliance upon evidence of any subsequent time period could improperly allow a parent to circumvent her own unfitness because of a bureaucratic delay in bringing her case to trial." *Reiny S.*, 374 Ill. App. 3d at 1046. Here, the motion to terminate parental rights alleged two nine-month periods, namely, September 8, 2019,

to June 8, 2020, and January 27, 2020, to October 27, 2020. We will address the first nine-month period.

¶ 40    Respondent contends the court erred in finding respondent unfit based on a lack of reasonable progress because the State and the court "relied exclusively on multi-level hearsay" in the State's exhibits to meet its burden of proof. Specifically, respondent argues the State failed to (1) lay a proper foundation for State's exhibit Nos. 1 through 10, (2) demonstrate any of the testimony was based on Chadwick or any other DCFS employee's personal knowledge, and (3) provide any other testimony relevant to respondent's alleged failure to complete recommended services. As stated above, State's exhibit Nos. 1 through 10 consisted of an integrated assessment, six service plans, and three environmental neglect investigation packets. Respondent acknowledges she failed to preserve the alleged error for review and asks this court to review the issue under the second prong of the plain-error doctrine.

¶ 41    Service plans and DCFS investigative records are admissible under section 2-18(4)(a) of the Juvenile Court Act (705 ILCS 405/2-18(4)(a) (West 2020)), which is a variation of the business record exception to the hearsay rule. *In re Aniylah B.*, 2016 IL App (1st) 153662, ¶ 30, 61 N.E.3d 216. Investigative packets containing indicated reports are admissible under section 2-18(4)(b) of the Juvenile Court Act (705 ILCS 405/2-18(4)(b) (West 2020) ("Any indicated report filed pursuant to the Abused and Neglected Child Reporting Act [(325 ILCS 5/1 *et seq*. (West 2020))] shall be admissible in evidence."). However, respondent argues the service plans and investigative packets at issue contain multiples levels of hearsay that cannot be admissible evidence merely because the hearsay appears in an otherwise admissible report. She contends the State was required to show each layer of hearsay contained in the service plans and investigation packets was excused by its own exception. See Illinois Rule of Evidence 805 (eff.

Jan. 1, 2011) ("Hearsay included within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule provided in these rules.").

¶ 42        Here, respondent has not shown the trial court's admission of the service plans and investigative packets was erroneous. First, as we also noted in *J.J.*, 2022 IL App (4th) 220131-U, ¶ 34, respondent "overlooks the fact the statute itself provides the lack of knowledge of the maker of the documents at issue is a matter of weight rather than admissibility." See 705 ILCS 405/2-18(4)(a) (West 2020) ("All other circumstances of the making of the memorandum, record, photograph or x-ray, including lack of personal knowledge of the maker, may be proved to affect the weight to be accorded such evidence, but shall not affect its admissibility."). This language necessarily "indicates the document will contain additional levels of hearsay." *J.J.*, 2022 IL App (4th) 220131-U, ¶ 34. The legislature specifically provided for the admission of DCFS records and the information contained therein so long as the State has met the statutory foundational requirements—*i.e.*, the information was made of record in the regular course of the agency's business and at the time of the event or within a reasonable time thereafter. See *Z.J.*, 2020 IL App (2d) 190824, ¶ 61. Chadwick specifically testified the service plans were prepared within the regular course of DCFS business and were periodically updated throughout the case. Further, as stated above, the investigative packets were admissible under section 2-18(4)(b) of the Juvenile Court Act (705 ILCS 405/2-18(4)(b) (West 2020)). We therefore conclude the State's foundation was adequate and the circuit court did not err by admitting the service plans and investigative packets.

¶ 43        Even assuming for argument the admission of the service plans and investigative packets was erroneous, respondent has not established second-prong plain error given Chadwick's

testimony regarding respondent's failure to make progress in the area of mental health and respondent's admissions she had to take multiple mental health assessments, struggled to find housing, and that her previous home with the children was "dirty." While the service plans provided documentation of respondent's failure to make progress towards the goal of reunification, they were cumulative evidence of Chadwick's and respondent's testimony. Accordingly, we do not find their admission was fundamentally unfair or undermined the integrity of the judicial process.

¶ 44          Moreover, the State provided ample evidence to establish respondent's unfitness without the allegedly inadmissible hearsay documents. Although Chadwick admitted he was not the caseworker but rather the supervisor, Chadwick testified he was familiar with the family and provided "at least monthly clinical supervision, if not weekly personal supervision on each case." Chadwick testified in detail regarding respondent's participation in services, her visitations with the children, and her engagement with the agency. As noted above, Chadwick testified respondent had not made progress in the area of mental health, and respondent herself testified she had to complete multiple mental health assessments because the agency believed she was not being truthful. Respondent was unsuccessfully discharged from family counseling services in January 2020 and did not complete a satisfactory mental health assessment until October 2020. Due to this delay, respondent did not engage in mental health counseling until May 2021—approximately six months after the goal had been changed and well beyond the nine-month period of September 8, 2019, to June 8, 2020, alleged in the motion to terminate parental rights.

¶ 45          Additionally, Chadwick specifically noted respondent had never reached a point where she was able to have unsupervised visits with the children. Respondent also acknowledged the case had been pending for two years, her previous residence with the children was "dirty," and

she struggled to find suitable housing due to a previous eviction. The circuit court also took judicial notice of its previous adjudicatory, dispositional, and permanency review orders, which further documented respondent's lack of progress. Based upon Chadwick's and respondent's testimony and the court's previous orders in the case, we conclude the circuit court's finding respondent failed to make reasonable progress during the period of September 8, 2019, to June 8, 2020, was not against the manifest weight of the evidence.

¶ 46　　　　Since we have upheld the circuit court's determination respondent met the statutory definition of an "unfit person" on the basis of her failure to make reasonable progress (750 ILCS 50/1(D)(m)(ii) (West 2020)) during the nine-month period of September 8, 2019, to June 8, 2020, we do not address the other nine-month period and the other grounds for the unfitness finding. See *In re Tiffany M.*, 353 Ill. App. 3d 883, 891, 819 N.E.2d 813, 820 (2004).

¶ 47　　　　　　　　　　C. Minor Children's Best Interests

¶ 48　　　　Last, respondent argues the circuit court's finding it was in the children's best interests to terminate her parental rights was against the manifest weight of the evidence.

¶ 49　　　　At the best interests hearing, the circuit court is to consider "the child[ren]'s welfare and whether termination would improve the child[ren]'s future financial, social and emotional atmosphere." *In re D.M.*, 336 Ill. App. 3d 766, 772, 784 N.E.2d 304, 309 (2002). To make this determination, section 1-3(4.05) of the Juvenile Court Act (705 ILCS 405/1-3(4.05) (West 2020)) sets forth factors the court must consider in the context of the children's age and developmental needs. See *In re T.A.*, 359 Ill. App. 3d 953, 959-60, 835 N.E.2d 908, 912-13 (2005). Those factors include the following: the children's physical safety and welfare; the development of the children's identity; the children's family, cultural, and religious background and ties; the children's sense of attachments, including continuity of affection for the children, the children's feelings of love,

being valued, security, and familiarity, and taking into account the least disruptive placement for the children; the children's own wishes and long-term goals; the children's community ties, including church, school, and friends; the children's need for permanence, which includes the children's need for stability and continuity of relationships with parent figures, siblings, and other relatives; the uniqueness of every family and each child; the risks attendant to entering and being in substitute care; and the wishes of the persons available to care for the children. 705 ILCS 405/1-3(4.05) (West 2020).

¶ 50    For parental rights to be terminated, the State must prove by a preponderance of the evidence that termination is in the minor children's best interests. See *D.T.*, 212 Ill. 2d at 366. "Proof by a preponderance of the evidence means that the fact at issue *** is rendered more likely than not." *People v. Houar*, 365 Ill. App. 3d 682, 686, 850 N.E.2d 327, 331 (2006).

¶ 51    Here, we conclude the State proved by a preponderance of the evidence it was in the minor children's best interests for respondent's parental rights to be terminated. At the best interests hearing, Blanco testified all of the children were bonded with their respective foster families, who met the children's individual needs. The foster parents, Kueker and Larrow, each testified they were willing to provide permanency for the children through adoption. Although A.D. struggled with behavioral and mental health issues because she missed her siblings and respondent, Kueker testified she had a strong bond and positive relationship with A.D. Larrow testified B.D., C.D., and D.D got along well and she was willing to ensure they maintained contact with A.D. While respondent had stable employment, was engaged with individual counseling, and helped to keep her current residence clean, her case had been pending for two years and she had not yet obtained housing suitable for her four children. Further, respondent still struggled with mental health issues and did not have a vehicle. DCFS counsel argued respondent had not shown

she was able to apply the concepts she learned in parenting classes to her interactions with the children. Despite some positive efforts on respondent's part, she failed to take affirmative steps necessary for the children to be returned to her care. Accordingly, we find the circuit court's conclusion it was in the minor children's best interests to terminate respondent's parental rights was not against the manifest weight of the evidence.

¶ 52                                     III. CONCLUSION

¶ 53          For the reasons stated, we affirm the Winnebago County circuit court's judgment.

¶ 54          Affirmed.

*In re D.D.*, 2022 IL App (4th) 220257

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Winnebago County, Nos. 19-JA-36 through 19-JA-39; the Hon. Mary Linn Green, Judge, presiding. |
| **Attorneys for Appellant:** | Gary D. McGuane, of DeKalb, for appellant. |
| **Attorneys for Appellee:** | J. Hanley, State's Attorney, of Rockford (Patrick Delfino, David J. Robinson, and James C. Majors, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |