NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2024 IL App (4th) 240896-U

NOS. 4-24-0896 & 4-24-0897 cons.

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
October 2, 2024
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* Chass. M. and Chasi. M., Minors | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Peoria County |
| Petitioner-Appellee, | ) | Nos.   21JA291 |
| v. | ) | 22JA96 |
| Shanteri L., | ) | |
| Respondent-Appellant). | ) | Honorable |
| | ) | David A. Brown, |
| | ) | Judge Presiding. |

JUSTICE GRISCHOW delivered the judgment of the court.
Presiding Justice Cavanagh and Justice Doherty concurred in the judgment.

**ORDER**

¶ 1     *Held*:  The appellate court granted appellate counsel's motion to withdraw and affirmed
                 the trial court's judgment terminating respondent's parental rights, concluding no
                 meritorious issues could be raised on appeal.

¶ 2          In June 2024, the trial court entered an order terminating the parental rights of

respondent, Shanteri L., to her minor children, Chass. M. (born in March 2021) and Chasi. M.

(born in May 2022). Respondent appealed, and counsel was appointed to represent her. Appellate

counsel now moves to withdraw, citing *Anders v. California*, 386 U.S. 738 (1967), on the basis

she cannot raise any potentially meritorious arguments on appeal. For the reasons that follow, we

grant the motion to withdraw and affirm the court's judgment.

¶ 3                              I. BACKGROUND

¶ 4                            A. Procedural History

¶ 5                    1. *The Opening of Chass. M.'s Case*

¶ 6        In July 2021, the State filed a petition seeking to adjudicate Chass. M. neglected

under the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/1-1 *et seq.* (West

2020)). The State alleged Chass. M. was neglected in that he tested positive at birth for cocaine

and tetrahydrocannabinol (THC) (*id.* § 2-3(1)(c)). The State also alleged Chass. M. was

neglected due to being in an environment injurious to his welfare for testing positive at birth for

cocaine and THC, as well as due to (1) respondent (and Chass. M.'s father, Daniel M., who is not

a party to this appeal) testing positive for THC in April 2021 (after respondent was prohibited

from having unsupervised contact with Chass M. until passing two random drug screens pursuant

to a safety plan implemented the previous month); (2) respondent missing medical appointments

related to Chass. M.'s diaper rash; (3) respondent stabbing Daniel in the arm while heavily

intoxicated in July 2021 and there being at least one prior incident of domestic violence between

them; (4) respondent testing positive for cocaine and THC in July 2021; (5) respondent having

been indicated by the Illinois Department of Children and Family Services (DCFS) for

substantial risk of physical injury/environment injurious to health and welfare by neglect and

substance misuse; (6) respondent having convictions for battery and criminal damage to

property; and (7) Daniel having seven convictions for battery and domestic battery (*id.* § 2-
3(1)(b)).

¶ 7        In October 2021, the trial court adjudicated Chass. M. neglected pursuant to

respondent's admission to the neglect petition. The same day, the court entered a dispositional

order finding respondent (and Daniel) unfit for reasons other than financial circumstances alone

(and Daniel also unwilling) to care for Chass. M., making Chass. M. a ward of the court and placing his guardianship and custody with DCFS.

¶ 8                              2. *The Opening of Chasi. M.'s Case*

¶ 9          In May 2022, the State filed a petition seeking to adjudicate Chasi. M. neglected under the Juvenile Court Act. The State alleged Chasi. M. was neglected due to being in an environment injurious to her welfare in that (1) Chass. M. was adjudicated neglected and both respondent and Daniel (who was also Chasi. M.'s father) were found unfit and had not been restored to fitness and (2) there was a history of domestic violence between respondent and Daniel (see 705 ILCS 405/2-3(1)(b) (West 2022)). In July 2022, the trial court adjudicated Chasi. M. neglected pursuant to respondent's stipulation to the neglect petition. The same day, the court entered a dispositional order finding respondent (and Daniel) unfit for reasons other than financial circumstances alone to care for Chasi. M. The court made Chasi. M. a ward of the court, placing her guardianship and custody with DCFS.

¶ 10                              3. *Permanency Review Orders*

¶ 11          Eventually, following a permanency review hearing in July 2023, the trial court entered an order keeping Chass. M.'s goal as substitute care pending the court's determination of termination of parental rights. Chasi. M's goal was also changed to substitute care pending the court's determination of termination of parental rights. The court's order further indicated, "State to Consider Filing a TPR [petition.]" Following a permanency review hearing in January 2024, the court entered an order keeping both minors' goals as substitute care pending court determination of termination of parental rights. The court's order further stated, "State to File [a] TPR [petition] within 30 Days."

¶ 12                    4. *Ex Parte Communication From Assistant State's Attorney*

¶ 13        The day after the January 2024 permanency review hearing, the State sent an

*ex parte* e-mail to the trial court, alerting it to Justice Steigmann's special concurrence in *In re*

*A.T.*, 197 Ill. App. 3d 821 (1990). This concurrence provided, "Of course, when a judge has

indicated there is a need for a petition to terminate parental rights to be filed, that judge must

thereafter recuse himself or herself from any proceedings on that petition once it is filed." *Id.* at

835 (Steigmann, J., specially concurring). The court entered an order "advis[ing] that further

*ex parte* communications will not be permitted or accepted."

¶ 14                              B. The Termination Petitions

¶ 15        In February 2024, the State filed petitions to terminate respondent's parental

rights to both minors. The State alleged respondent was unfit for failing to make reasonable

progress toward the minors' return during the nine-month period following the adjudication of

neglect spanning from November 19, 2022, to August 19, 2023 (the relevant period) (750 ILCS

50/1(D)(m)(ii) (West 2022)).

¶ 16                              C. The Fitness Hearing

¶ 17        The trial court conducted the fitness hearing in June 2024.

¶ 18                              1. *The State's Evidence*

¶ 19        The trial court began the hearing by admitting four exhibits into evidence. Those

were (1) respondent's drug drop records from Help at Home, (2) respondent's substance abuse

treatment records from Trillium Place, (3) respondent's counseling records from Lutheran Social

Services of Illinois (LSSI), and (4) a certified copy of respondent's March 2023 conviction for

disorderly conduct.

¶ 20	Cheyenne Denoyer was the LSSI caseworker assigned from November 19, 2022, to August 16, 2023. Denoyer testified respondent was required to undergo a mental health evaluation and any recommended counseling, substance abuse treatment, three drug drops per month, and domestic violence classes. (Respondent had previously completed parenting classes.) Respondent was unsuccessfully discharged from counseling during the relevant period for never attending any sessions, despite being assigned a counselor. Respondent completed substance abuse treatment on January 8, 2023, and subsequently attended support group sessions. When Denoyer was first assigned to the minors' cases, respondent was doing drug drops, though she was not "perfect" in her consistency. Moreover, during the relevant period and after completing substance abuse treatment, respondent tested positive at least once for cocaine, twice for alcohol, and "consistently for marijuana." Respondent did not successfully complete domestic violence classes. Respondent was never allowed unsupervised visitation or any increase in her supervised visitation. Denoyer never even discussed increasing respondent's visitation time. When asked why, Denoyer explained:

> "It was a culmination of different reasons. There were multiple police reports. There were substance use concerns. There were behavioral concerns. [Respondent] wasn't engaging in her mental health counseling. [Respondent] was dropped from domestic violence counseling. So I think at that time, it was a culmination of a lot of things."

¶ 21	For these reasons, Denoyer did not feel it was safe to return the minors to respondent's care at the end of the relevant period. On cross-examination, Denoyer acknowledged writing in a report in January 2023 that (1) respondent displayed appropriate

parenting skills during her visits with the minors, (2) respondent "share[d] a good bond" with the minors, (3) the minors "appear[ed] to enjoy their visits," (4) there were "no concerns regarding [respondent's] parenting abilities," and (5) respondent had "made progress" since the last hearing.

¶ 22                    2. *The Trial Court's Unfitness Determination*

¶ 23        After hearing arguments from the attorneys, the trial court delivered its unfitness determination. The court began by acknowledging Denoyer's testimony about the visits between respondent and the minors going well and respondent having "made progress." The court continued:

"I guess on the other side of the coin, *** it's also been established that [respondent] was not making any progress in counseling during the nine-month period of time.

[Respondent] did have positive drops for cocaine and alcohol and consistently tested positive for THC. And those—at least some of those positive drops occurred after [respondent's] completion of the drug treatment program ***.

***

There's no documentation of [respondent] completing domestic violence courses, but there's also insufficient evidence of whether she was engaged or not."

¶ 24        The trial court then noted respondent's criminal conviction for disorderly conduct during the relevant period. The court also referred to Denoyer's testimony about respondent

- 6 -

never being granted either unsupervised visitation or an increase in her supervised visitation "at any time" during the relevant period.

¶ 25 The trial court explained, "[W]e were no nearer [to] the return of these [minors] to her care at the end of the [relevant period] as we were at the beginning." Accordingly, the court found the State met its burden of proving by clear and convincing evidence respondent failed to make reasonable progress toward the return of the minors during the relevant period.

¶ 26 D. The Best-Interest Hearing

¶ 27 The trial court immediately proceeded to the best-interest hearing. The court noted LSSI caseworker Jarret Witmer filed a report in advance of the best-interest hearing.

¶ 28 1. *The Best-Interest Report*

¶ 29 Chass. M. moved to his current placement on September 19, 2023. Chass. M. had "adjusted very well to this placement." Chass. M.'s foster parents had been consistent parental figures and intended to provide him a permanent placement. Chass. M.'s new foster parents ensured he was up to date on medical examinations and immunizations and provided for all his medical needs, including a nebulizer and inhaler for breathing difficulties. Chass. M. was attending daycare and was on target both developmentally and educationally. Chass. M.'s foster parents were providing for all his needs. Chasi. M. had been in her current foster placement since she was three days old and had "adjusted very well" to it. Chasi. M.'s foster parent had been a consistent parental figure and intended to provide her a permanent placement. Chasi. M. was on target developmentally and had no significant medical needs. Chasi. M.'s foster parent was providing for all her needs.

¶ 30 Chass. M. had developed a "strong attachment with his caregivers and view[ed] them as his parents." Chasi. M.'s foster placement was the only home she had since she was

three days old. By contrast, neither of the minors demonstrated a bond with respondent. While visits were scheduled on a monthly basis, they were sporadic due to respondent either canceling them or not confirming them.

¶ 31 Witmer wrote it was in the minors' best interest for respondent's parental rights to be terminated. Witmer explained:

> "[Respondent] appears to love [the minors] but has failed to make the changes in her life that would be necessary for her to have the [minors] returned to her care. ***
>
> ***
>
> [Respondent has] been unable to demonstrate the ability to provide for [the minors] in relation to minimum parenting standards. Services have been provided and referred *** and little progress towards completion has been made. *** [Respondent] has a significant history of substance use (cocaine and THC), criminal involvement[,] and relationships involving domestic violence. Despite being offered services to address these issues, [respondent] continues to not complete drug drops or treatment and continues to have criminal involvement. [Respondent] continues to not maintain any form of stability."

¶ 32       2. *The State's Evidence*

¶ 33        a. Jarret Witmer

¶ 34 LSSI caseworker Jarret Witmer had been assigned to the minors' cases since January 30, 2024. Witmer visited Chass. M. in his foster home once a month and Chasi. M. in

her foster home twice a month. Both minors were safe and had adequate food and appropriate sleeping arrangements in their foster homes. Chass. M. was scheduled to have his tonsils removed in July 2024. Chass. M. was strongly bonded to his foster parents, and Witmer observed that he hugged them, told them he loved them, and was respectful towards them. Chass. M.'s foster parents had him involved in family activities. Chasi. M. was strongly bonded with her foster parent. Witmer believed it was in the minors' best interest to be adopted by their foster parents, whom he described as "fantastic."

¶ 35                                          b. Breonna C.

¶ 36          Breonna C. testified she had been Chass. M.'s foster mother since September 19, 2023. Breonna and her partner, Anna M., also had an 11-year-old child in their home, with whom Chass. M. got along well. Breonna brought Chass. M. along for "all" events with extended family members. Breonna testified that she and Anna love Chass. M. and were willing to adopt him and maintain his bond with Chasi. M.

¶ 37                                          c. Iesha F.

¶ 38          Iesha F. testified she had been Chasi. M.'s foster mother since she was three days old. Iesha has three biological children, who love Chasi. M. and treat her as "their sister." Together, they engage in activities and events with family members. Iesha testified that she has a "very strong bond" with Chasi. M. and wants to provide permanency for her. Iesha was willing to maintain the sibling bond with Chass. M. if Chasi M was adopted.

¶ 39                          3. *The Trial Court's Best-Interest Determination*

¶ 40          The trial court explained it was considering the best-interest report and testimony in relation to the statutory best-interest factors. The court noted the minors' foster parents have been providing for their physical safety and welfare "for an extended period of time" and "we're

at a point where [respondent] has not been able to demonstrate the ability to provide for the physical safety and welfare of [the minors] during that period of time." The court noted the minors' identity, background, and ties were forming in substitute care with their foster families. The minors' senses of security, familiarity, and continuity of affection were likewise forming with their foster families. The consideration of the least disruptive placement alternative favored termination of respondent's parental rights. The court also noted the increasing importance of the minors' needs for permanence, stability, and continuity of their relationships "so that they can form their sense of attachment and grow and mature." Emphasizing respondent's ongoing criminal issues, the minors' needs for permanency, and the lack of a reasonably foreseeable ability to return the minors to respondent's care, the court found the State had met its burden of proving by a preponderance of the evidence termination of respondent's parental rights would be in the minors' best interest.

¶ 41                                II. ANALYSIS

¶ 42        Appellate counsel seeks to withdraw on the basis she cannot raise any arguments of potential merit.

¶ 43        The procedure for appellate counsel to withdraw set forth in *Anders* applies to findings of parental unfitness and termination of parental rights. *In re S.M.*, 314 Ill. App. 3d 682, 685 (2000). According to this procedure, counsel's request to withdraw must "be accompanied by a brief referring to anything in the record that might arguably support the appeal." *Anders*, 386 U.S. at 744. Counsel must "(a) sketch the argument in support of the issues that could conceivably be raised on appeal, and then (b) explain why [s]he believes the arguments are frivolous." *S.M.*, 314 Ill. App. 3d at 685. Counsel must then conclude the case presents no viable

grounds for appeal. *Id.* In doing so, counsel should review both the unfitness and best-interest findings and indicate in the brief that she has done so. *Id.* at 685-86.

¶ 44   Here, counsel states she has reviewed the record on appeal. The brief demonstrates she has reviewed the report of the termination proceeding. The record indicates counsel sent a copy of her motion and brief to respondent by mail. This court allowed respondent until August 29, 2024, to file a response. Respondent did not file a response. Counsel states any argument the trial court erred in finding respondent unfit for failing to make reasonable progress during the relevant period would be frivolous given her (1) failure to complete domestic violence classes; (2) failure to attend (much less complete) counseling; (3) continuing positive tests for various substances, even after completing substance abuse treatment; (4) failure to make sufficient progress in services to warrant an increase in supervised visitation (much less to allow unsupervised visitation); and (5) conviction for disorderly conduct during the relevant period. Counsel also states any argument the court erred in finding it was in the minors' best interest to terminate respondent's parental rights would be frivolous given the pertinent evidence in the record, including the best-interest report. Finally, counsel states any argument the trial judge should have recused himself after ordering the State to file a petition to terminate respondent's parental rights would be frivolous because (1) neither respondent nor the State ever filed a motion for substitution of judge or otherwise raised this issue before or during the termination proceeding and (2) counsel cannot speculate whether the State filed the termination petition based solely on the court's instruction or whether it already believed it to have been warranted at that time. We address each argument in turn and ultimately agree with counsel's conclusion there are no issues of arguable merit to be raised on appeal.

¶ 45                      A. The Unfitness Finding

¶ 46        Parental rights may not be terminated without the parent's consent unless the trial court first determines, by clear and convincing evidence, the parent is unfit as defined in section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2022)). *In re Gwynne P.*, 215 Ill. 2d 340, 354 (2005). A parent may be found unfit if she fails "to make reasonable progress toward the return of the child to the parent during any 9-month period following the adjudication of neglected or abused minor." 750 ILCS 50/1(D)(m)(ii) (West 2022). This court has defined "reasonable progress" as follows:

> " 'Reasonable progress' is an objective standard which exists when the [trial] court, based on the evidence before it, can conclude that the progress being made by a parent to comply with directives given for the return of the child is sufficiently demonstrable and of such a quality that the court, in the near future, will be able to order the child returned to parental custody. The court will be able to order the child returned to parental custody in the near future because, at that point, the parent will have fully complied with the directives previously given to the parent in order to regain custody of the child." (Emphases omitted.) *In re L.L.S.*, 218 Ill. App. 3d 444, 461 (1991).

¶ 47        We will not disturb a finding of unfitness unless it is against the manifest weight of the evidence. *In re J.H.*, 2020 IL App (4th) 200150, ¶ 68. "A finding is against the manifest weight of the evidence only if the evidence clearly calls for the opposite finding [citation], such that no reasonable person could arrive at the [trial] court's finding on the basis of the evidence in the record [citation]." (Internal quotation marks omitted.) *Id.*

¶ 48    Here, the evidence established respondent failed to make reasonable progress towards the return of the minors to her care during the relevant period. Respondent was required to undergo a mental health evaluation and any recommended counseling, substance abuse treatment, three drug drops per month, and domestic violence classes. Despite being assigned a counselor, respondent did not attend any sessions during the relevant period and was unsuccessfully discharged from counseling. Respondent completed substance abuse treatment during the relevant period and subsequently attended support group sessions. However, reports submitted for the permanency review hearings during the relevant period reflected respondent failed to appear for 11 drug drops. Moreover, respondent tested positive at least once for cocaine, twice for alcohol, and 14 times for marijuana during the relevant period. The cocaine-positive test, the two alcohol-positive tests, and 12 of the 14 marijuana-positive tests were after January 8, 2023, after respondent completed substance abuse treatment. Respondent did not complete domestic violence services. Furthermore, respondent was never allowed either unsupervised visitation or even an increase in supervised visitation during the relevant period. Denoyer was never even able to discuss these options due to respondent's ongoing criminal activity, substance abuse, behavioral concerns, and inadequate engagement in services. Thus, the evidence established respondent had not made sufficiently demonstrable progress in her services for the trial court to be able to return the minors to her care. Accordingly, we agree with counsel no meritorious argument can be made that the court's unfitness finding was against the manifest weight of the evidence.

¶ 49                    B. The Best-Interest Finding

¶ 50    When a trial court finds a parent to be unfit, "the court then determines whether it is in the best interests of the minor that parental rights be terminated." *In re D.T.*, 212 Ill. 2d 347,

- 13 -

352 (2004). "[A]t a best-interests hearing, the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *Id.* at 364. In making the best-interest finding, the court must consider the factors set forth in section 1-3(4.05) of the Juvenile Court Act (705 ILCS 405/1-3(4.05) (West 2022)). These factors include:

> "(1) the child's physical safety and welfare; (2) the development of the child's identity; (3) the child's background and ties, including familial, cultural, and religious; (4) the child's sense of attachments, including love, security, familiarity, and continuity of affection, and the least-disruptive placement alternative; (5) the child's wishes; (6) the child's community ties; (7) the child's need for permanence, including the need for stability and continuity of relationships with parental figures and siblings; (8) the uniqueness of every family and child; (9) the risks related to substitute care; and (10) the preferences of the persons available to care for the child." *In re Jay. H.*, 395 Ill. App. 3d 1063, 1071 (2009) (citing 705 ILCS 405/1-3(4.05) (West 2008)).

¶ 51    Here, the evidence established it was in the minors' best interest to terminate respondent's parental rights. Breonna and Anna were consistent parental figures who wanted to provide permanency for Chass. M. The evidence shows they ensure all of Chass. M.'s needs are met, including his medical needs, which require his use of an inhaler and nebulizer for his breathing difficulties. Living with Breonna and Anna, Chass. M. attends daycare and is on target both developmentally and educationally. Chass. M. gets along with the 11-year-old child in the

foster home and has been included in all events with Breonna and Anna's family members. Breonna and Anna are willing to adopt Chass. M. and maintain his bond with Chasi. M.

¶ 52　　　　Iesha has been a consistent parental figure for Chasi. M. since she was three days old and intends to provide her a permanent placement. Chasi. M. is on target developmentally and has no significant medical needs. Iesha provides for all her needs. Iesha's biological children love Chasi. M. and treat her like "their sister." Iesha includes Chasi. M. in activities and events with family members. Iesha stated that she is willing to maintain the sibling bond with Chass. M. once Chasi. M. is adopted.

¶ 53　　　　Both minors are safe and have adequate food and appropriate sleeping arrangements in their foster homes. Chass. M. is strongly bonded with Breonna and Anna. Iesha has a "very strong bond" with Chasi. M. and wants to provide permanency for her. By contrast, neither of the minors demonstrated a bond with respondent. While visits were scheduled on a monthly basis, they were sporadic due to respondent either canceling or not confirming appointments. While respondent loved the minors, she failed to make the changes in her life necessary to have them returned to her care. Witmer believed it was in the minors' best interest to be adopted by their foster parents. In light of the foregoing evidence, the trial court found the State had met its burden of proving by a preponderance of the evidence termination of respondent's parental rights would be in the minors' best interest. Based on the evidence adduced, we agree with appellate counsel no meritorious argument can be made that the court's best-interest finding was against the manifest weight of the evidence.

¶ 54               C. The Trial Court's Response to the State's *Ex Parte*

                              Communications

¶ 55            Following a permanency review hearing in July 2023, the trial order stated, "State

to File [a] TPR [petition] within 30 Days." The next day, the State sent an *ex parte*

communication to the judge alerting it to Justice Steigmann's special concurrence in *A.T.*, 197

Ill. App. 3d 821.

¶ 56            In connection with the motion to withdraw, appellate counsel proposes a

conceivable argument on appeal could be that the trial judge should have recused himself after

ordering the State to file a termination petition. However, counsel asserts such an argument

would be without arguable merit in that (1) neither respondent nor the State ever filed a motion

for substitution of judge or otherwise raised this issue before or during the termination

proceeding and (2) counsel cannot speculate whether the State filed the termination petition

based solely on the court's instruction or whether it already believed it to have been warranted at

that time.

¶ 57            In *A.T.*, this court affirmed the trial court's termination of the respondent's

parental rights after giving the respondent both the time and opportunity to make reasonable

progress. The respondent failed, and the appellate court held the trial court was justified in

terminating parental rights. *A.T.*, 197 Ill. App. 3d at 830. Justice Steigmann observed:

              "The evidence as reviewed by the majority demonstrates

              that the responsible authorities waited much too long for

              respondent 'to get her act together' before this [termination]

              petition was filed. ***

If neither DCFS nor the appropriate State's Attorney's office acts promptly to seek to terminate parental rights when that action is called for, then, as a last resort, the trial court must alert these agencies to the need to do so. Once the trial court makes its views known, I seriously doubt that it would ever need to take the extraordinary (and probably unwise) step of *directing* the State's Attorney to file a petition to terminate parental rights, assuming that the court even had the authority to do so under *** the Juvenile Court Act [citation]. Of course, when a judge has indicated there is a need for a petition to terminate parental rights to be filed, that judge must thereafter recuse himself or herself from any proceedings on that petition once it is filed." (Emphasis in original.) *Id.* at 835 (Steigmann, J., specially concurring).

¶ 58 In *In re D.D.*, 2022 IL App (4th) 220257, ¶ 35, this court noted Justice Steigmann's concern was limited to a situation where "a *judge* has indicated a need for filing a petition to terminate parental rights," in which case "the judge must recuse herself from any proceedings on that petition once it is filed." (Emphasis in original.) This was not required where the trial court changed the goal at the request of the State and the guardian *ad litem* and where the court did not *sua sponte* announce there was a need for a termination petition to be filed. *Id.*

¶ 59 Here, one of the trial court's orders suggested the State "consider" filing a termination petition but did not direct the State to actually file it. The subsequent order setting the goals for both minors as substitute care pending determination of termination of parental rights required the petition be filed within 30 days. However, there is nothing in the record to

suggest the filing of the termination petition resulted from any *sua sponte* decision by the trial court to proceed to terminate respondent's parental rights, as opposed to acting on a request by the State and/or guardian *ad litem* to change the goals. Given this court's qualification in *D.D.* of Justice Steigmann's special concurrence in *A.T.*, the trial judge was not obligated to recuse himself once the termination petition was filed. See *In re R.D.*, 2023 IL App (4th) 230636-U, ¶ 55 (noting that in neither *D.D.* nor *In re J.J.*, 2022 IL App (4th) 220131-U, were the concerns of Justice Steigmann's special concurrence in *A.T.* present). Neither the State nor respondent ever filed a motion for substitution of judge or otherwise raised this issue with the court during the termination proceeding. Consequently, this court agrees with counsel that no meritorious argument could be made the trial judge was obligated to recuse himself after entering the order requiring the State to file a petition to terminate respondent's parental rights.

¶ 60                    III. CONCLUSION

¶ 61           For the reasons stated, we grant appellate counsel's motion to withdraw and affirm the trial court's judgment.

¶ 62           Affirmed.

- 18 -